# EXHIBIT A

 HOME POINT FINANCIAL

# CORRESPONDENT MORTGAGE LOAN PURCHASE AGREEMENT

This Correspondent Mortgage Loan Purchase Agreement ("Agreement") is made this 26th day of April_____, 20 19___, by and between AHL FUNDING_____ ("Correspondent"), a CA CORP_____. ("Entity type") and Home Point Financial Corporation ("Purchaser"), *a New Jersey corporation.* In this Agreement, Purchaser and Correspondent are collectively referred to as the "Parties" and individually as a "Party." The rights, privileges, and duties defined in this Agreement shall inure to the benefit of Purchaser.

WHEREAS, Correspondent is in the business of originating, processing applications for, and preparing and arranging the closing and funding of residential mortgage loans. Purchaser is in the business of purchasing such closed residential mortgage loans that conform to the terms and conditions set forth below; to agency and investor guidelines and requirements including FNMA, FHLMC, FHA, GNMA, HUD, VA, USDA and any other investor to whom Purchaser may transfer a mortgage loan (collectively, "Investor Guidelines"); to the published and updated program, underwriting and appraisal guidelines released by Purchaser ("Guidelines"); and to the Correspondent Seller Guide ("Seller Guide").

WHEREAS, Purchaser and Correspondent have agreed to enter into a non-exclusive business arrangement under which Correspondent originates mortgage loans ("Loans") in states where Correspondent and Purchaser are duly licensed to be secured by mortgages, deeds of trust or security deeds ("Security Instruments") on residential real property ("Mortgaged Property"), closes and funds such Loans in its own name and sells such closed Loans, together with the servicing rights, to Purchaser. The purpose of this Agreement is to define the duties, responsibilities and obligations of each Party.

WHEREAS, Purchaser has, from time to time, published and updated its Guidelines and Correspondent Seller Guide for correspondent lending ("Seller Guide"), which set forth additional representations, covenants, warranties and rights of the Parties and the contents of those are specifically incorporated in this Agreement as if more fully set forth at length. If any term or condition of this Agreement is inconsistent, ambiguous, adverse, or otherwise in conflict with any word, sentence, paragraph or provision of either the Guidelines or Seller Guide, then the Guidelines or Seller Guide shall control and prevail.

NOW, THEREFORE, in consideration of the mutual promises made in this Agreement and for good and other valuable consideration, the receipt and adequacy of which is acknowledged, the Parties agree as follows:

 HOME POINT FINANCIAL

## CORRESPONDENT DUTIES

1. **Submission, Underwriting, and Purchase from Correspondents.** Correspondent may submit to Purchaser (i) complete Loan Packages ("Loan Packages") and (ii) Closed Loans, including the related mortgage servicing rights arising from same on a servicing-released basis ("Closed Loans"), both as further defined by the Guidelines and Seller Guide. Upon receipt, Purchaser may at its option, and in its sole discretion, underwrite Loan Packages for Correspondent or agree to purchase any one or more of such Closed Loans at a time and date to be unilaterally determined by Purchaser. Purchaser will notify Correspondent of all decisions in writing. The failure or omission by Purchaser to issue a decision on a submitted Loan Package or a Closed Loan shall not be considered an admission by Purchaser of an intent to buy. Correspondent shall complete the registration and approval process prescribed by Purchaser prior to submitting any Loan Packages or Closed Loans, including, but not limited to, providing all corporate or entity ownership, financial and business information requested by Purchaser.

2. **Loan Purchase and Purchase Advice.** Provided that (i) Correspondent complies with the terms of this Agreement, the Guidelines and the Seller Guide, and (ii) the Loan Package or Closed Loan conform with Purchaser's then applicable underwriting standards and Investor Guidelines, Purchaser may, in Purchaser's sole and absolute discretion, issue a Purchase Advice. Purchaser is under no duty, legal, equitable or otherwise, or contractual obligation to issue a Purchase Advice, accept or approve any prospective Loan Package, complete or incomplete, submitted by Correspondent, or purchase any Closed Loans offered for sale by Correspondent. Purchaser shall have the sole and absolute right and discretion, without cause or limitation, to reject any submission by Correspondent.

3. **Withdrawal of Submission; Release of Claim.** Although Correspondent has no affirmative obligation to submit Loan Packages and Closed Loans to Purchaser, by freely and voluntarily selecting Purchaser as an offeree Correspondent agrees that no submissions may be withdrawn prior to a written decision by Purchaser. If Purchaser elects to purchase a Loan Package or Closed Loan, then Correspondent's obligation to deliver same to Purchaser shall be legally binding and enforceable against Correspondent. Purchaser will use reasonable and customary efforts as is commonplace in the industry in reviewing submitted Loan Packages and Closed Loans, but Correspondent acknowledges that all of Purchaser's decisions and interpretations are subjective. Accordingly, Correspondent fully releases, discharges and waives any actual or potential claim it may have against Purchaser arising from or related to Purchaser's refusal to purchase a Loan Package or Closed Loan, including, without limitation, lost profits, incidental or consequential damages, costs, expenses and fees (including attorneys' fees).

 HOME POINT FINANCIAL

4.   Mortgage Loan Document Delivery.  Correspondent shall deliver to Purchaser all mortgage loan documents in the manner required by the Guidelines and Seller Guide and on the date specified by Purchaser prior to funding (the "Delivery Date"). If Correspondent fails to do so, Purchaser, in its sole discretion, may elect not to purchase the Loan Package or Closed Loan. The mortgage loan documents to be delivered by Correspondent on the Delivery Date include all documents required by Purchaser's Seller Guide, Guidelines and the applicable Investor Guidelines, including, without exception, the original Mortgage Note properly endorsed to the satisfaction of Purchaser. Correspondent acknowledges and agrees that the Delivery Date communicated by Purchaser is binding on Correspondent and may only be extended or modified by Purchaser in writing. Purchaser shall have the sole and absolute right and discretion, without cause or limitation, to reject any request for extension of the Delivery Date and Purchaser shall have no liability to Correspondent of any kind for rejection, in whole or in part, of a request for extension of any Delivery Date.

5.   Cancellation of Purchase Advice. Any Purchase Advice issued is voidable by Purchaser if Purchaser reasonably believes that Correspondent breached any material term or condition of this Agreement as to any Loan Package or Closed Loan offered for purchase, or as to any Loan Package or Closed Loan actually purchased by Purchaser from Correspondent. Purchaser may void such a Purchase Advice by giving written notice of same to Correspondent at any time prior to the transfer of such Loan Package or Closed Loan.

6.   Provision of Records. For Purchaser's internal business purposes, or for assisting Purchaser's response to any of its prudential regulators, Purchaser may request, and Correspondent shall provide, documents and records from time to time, including, without limitation, annual financial statements; updates and reverifications of information provided by Correspondent in its application to do business with Purchaser; verification(s) of Correspondent's insurance coverages; Correspondent's annual internal quality control audits and procedures; external audits or reviews of Correspondent conducted by any agency or investor; licensure information for Correspondent's principals, officers and employees; and copies of all non-mortgage related business licenses or permits otherwise required for Correspondent to conduct business in any jurisdiction and locality where it operates.

CORRESPONDENT REPRESENTATIONS, WARRANTIES AND AGREEMENTS

7.   Correspondent Representations and Warranties. Correspondent unequivocally and unconditionally represents and warrants to Purchaser and agrees as follows as of the date of this Agreement. These representations, warranties and agreements shall remain binding upon Correspondent during the term of this Agreement:

 HOME POINT FINANCIAL

A. Correspondent is duly organized and in good standing under the laws of the state of its organization, and has all applicable permits, licenses and registrations in each jurisdiction and locality where it conducts business. Correspondent has the requisite authority and capacity to enter into this Agreement (including any necessary corporate resolution) and doing so will not violate any provisions of its organizational documents or any other contract or agreement to which Correspondent is subject. Correspondent is the sole owner of the Loan Package or Closed Loan and has the authority to sell, transfer and assign the same to Purchaser, and to sell, transfer and assign to Purchaser any payments owing, the related servicing rights, and each mortgage free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest.

B. All Loan Packages and Closed Loans have been "originated," which is defined for purposes of this Agreement to mean conduct of the initial borrower interview and the obtaining of a completed Form 1003 Uniform Residential Loan Application by employees of Correspondent licensed with the Nationwide Mortgage Licensing System ("NMLS") to originate residential mortgage loans for the appropriate state at the time the interview is conducted. Correspondent further represents and warrants that each Loan Package or Closed Loan sold to Purchaser meets the applicable underwriting and other product eligibility requirements established by Purchaser for the Loans.

C. On all Loan Packages and Closed Loans, Correspondent has complied with all provisions of the Seller Guide, the Guidelines, the Investor Guidelines, and all other covenants in this Agreement. Correspondent has made full, truthful and accurate disclosure to Purchaser of all facts, information and documentation pertaining to its submission of any Loan Package or Closed Loan and is unaware, does not know or suspect, or have constructive notice of adverse circumstances or issues which could impact the integrity, salability or the ability of the Loans to be securitized by any agency or investor or which may otherwise have any bearing on Purchaser's decision to acquire the Loan Package or Closed Loan.

D. All defects, errors, deviations, variations, irregularities and discrepancies, both actual and perceived, on all Loan Packages and Closed Loans have been fully and thoroughly investigated, resolved, cured and remediated by Correspondent prior to submission to Purchaser. No conditions (including underwriting or closing conditions) or contingencies remain outstanding.

E. The Loan Packages and Closed Loans submitted by Correspondent to Purchaser do not contain any material or clerical errors, omissions, misrepresentations, untrue statements, falsified or incomplete documents or exhibits, misleading explanations, negligence, identity theft, fraud, or evidence of illegal activity or similar misconduct by the Correspondent, its officers, agents and employees, the borrowers, seller, realtor, appraiser, title company, settlement/closing agent,

**HOME POINT FINANCIAL**

home inspector, builder or any other party involved in the Loan. Any evidence or instance, actual or circumstantial, of the existence of any prohibited conduct on any Loan Package or Closed Loan, without regard to the time sequence of the date of discovery by Purchaser, will result in the immediate issuance of a written repurchase demand, automatic termination of this Agreement and possible referral of any alleged civil or criminal misconduct to the appropriate authorities.

F.  All Closed Loans include a Security Instrument that is a genuine, valid and enforceable first lien; a Security Instrument has been recorded in the proper recording office; the Security Instrument has been properly executed, witnessed, initialed and notarized by all required signatories; a final American Land Title Association (ALTA)-compliant Lender's policy of title insurance in the minimum amount of the loan has been paid for and issued; and a hazard insurance policy and a flood insurance policy (if applicable, including an RCBAP Master Policy for condominium projects) meeting the requirements of the Flood Disaster Protection Act of 1973 and FNMA/FHLMC where applicable, have been issued for the Mortgaged Property and will remain in force for at least sixty (60) days following the date of transfer to Purchaser. The Security Instrument has not been satisfied, compromised, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property is not subject to any condemnation proceedings, is free of substantial damage (including, but not limited to damage by fire, windstorm or other casualty) and is in good repair. Correspondent, at its sole cost and expense, shall prepare and deliver an original executed Assignment of the Security Instrument in recordable form to Purchaser. Correspondent has complied with all other terms and conditions of the Seller Guide, the Guidelines, and the Investor Guidelines in its origination of the Loan Packages and Closed Loans, which are incorporated by reference into this representation and warranty.

    i.   There are no delinquent taxes, ground rents, water charges, sewer rents, assessments, insurance premiums, leasehold payments, including assessments payable in future installments or other outstanding' charges affecting the Mortgaged Property securing the Loan.

    ii.  There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the Mortgaged Property related to any Loan which are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage related to the Loan.

    iii. All improvements which were considered in determining the appraised value of the Mortgaged Property related to any Loan lay wholly within the boundaries and building restriction lines of the such Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property.

 **HOME POINT FINANCIAL**

G. All Closed Loans include a genuine, valid and enforceable original Note properly executed by all borrowers. The Note has not been impaired, waived, altered or modified, and is not subject to any right of rescission, set-off, counterclaim or defense by the borrower arising from the acts or omissions of Correspondent in its origination of the Loan Packages or Closed Loans. Correspondent shall endorse the original Note to Purchaser upon issuance of the Purchase Advice.

H. Private Mortgage Insurance. If any Loans are required to be insured or guaranteed by Purchaser pursuant to a contract of insurance with a mortgage insurance company as a condition of purchase in the Purchase Advice, Correspondent has complied with all applicable provisions of the mortgage insurance contract or guarantee and the insurance or guarantee is (or will be at loan closing) in full force and effect. If any certificates of mortgage insurance for a Closed Loan are issued in Correspondent's name, Correspondent shall have the certificates transferred, assigned or issued to Purchaser at the time of the transfer of the Loans to Purchaser.

I. Rate Locks. Correspondent is fully familiar with Purchaser's rate lock and Loan Delivery procedures as contained in the Seller Guide inclusive of the potential for expiration, adjustments, re-pricing and cancellation of the Loan Package or Closed Loan in its entirety. Purchaser shall not be liable to Correspondent for any economic or monetary damages or injuries if a Closed Loan is not timely purchased. As used in this Agreement, the term "Rate Lock" shall mean the communication between Purchaser and Correspondent whereby Purchaser agrees to purchase a Loan Package or Closed Loan at a particular interest rate within a particular time period, and Correspondent agrees to originate a Loan Package or Closed Loan at that interest rate and within that time period.

J. Correspondent is, or will be at the time of closing, the named mortgagee for all Closed Loans sold by Correspondent to Purchaser under this Agreement. All funds pertaining to the Closed Loans have been fully and properly disbursed at closing and the borrowers are not entitled to any refunds.

K. On all Closed Loans, all monthly payments due and payable from borrowers prior to the date of submission to Purchaser have been timely received and properly credited. No Closed Loans contain any borrower defaults or late payments.

L. On all Loan Packages and Closed Loans, Correspondent has not received any Notice of Commencement of a Bankruptcy Petition or other insolvency proceeding filed by or on behalf of any borrower, nor is Correspondent aware of any adverse or negative credit report or


HOME POINT FINANCIAL

incident concerning the borrowers subsequent to the date of loan closing/settlement. Correspondent further represents and warrants that on all Loan Packages and Closed Loans, no borrower has incurred new debt subsequent to the dates of the initial Form 1003 Uniform Residential Loan Application and credit report, nor has any borrower failed to disclose any debt or credit obligation to Correspondent.

M. No Closed Loan submitted to Purchaser by Correspondent has been previously rejected for purchase by other investors, lenders or secondary market participants, without written notice to Purchaser.

N. Correspondent has not made any prior sale, pledge, or assignment of any Closed Loan covered by this Agreement, or any portion of such Closed Loan to any other person or entity, which shall not be automatically released upon Purchaser's payment for the purchase of the Closed Loan.

O. Correspondent agrees to review Purchaser's Guidelines and Seller Guide from time to time and to remain current. Correspondent acknowledges that Purchaser reserves the right to modify these documents and agrees to comply with any changes or modifications following written notice from Purchaser. Correspondent may terminate this Agreement pursuant to Section 16 hereof upon written notice to Purchaser of Correspondent's rejection of changes to Purchaser's programs and policies within ten business days of the applicable Amendment Effective Date of the change to which Correspondent objects. Notwithstanding any termination pursuant to this Section 7(O), Purchaser may nevertheless agree to purchase any "pipeline" Loan which otherwise qualifies for purchase under this Agreement, without giving effect to the program and policy changes giving rise to Correspondent's election to terminate the Agreement. For this purpose, a "pipeline" Loan is a Loan as to which Correspondent has received, prior to the termination date of this Agreement, an application from the prospective borrower and has commenced processing.

P. All Loan Packages and Closed Loans comply with all federal, state and local laws, statutes, rules, regulations, ordinances, decisions, policies, directives and case law, including, without limitation, applicable state and local lending and licensing laws, state mortgage loan consumer and borrower disclosure requirements, federal laws including the Fair Credit Reporting Act, Fair Housing Act, Real Estate Settlement Procedures Act ("RESPA"), Truth in Lending Act ("TILA"), the Consumer Financial Protection Bureau's ("CFPB") TILA-RESPA Integrated Disclosure Rule ("TRID"), Equal Credit Opportunity Act, Consumer Credit Protection Act, the Flood Disaster Protection Act of 1973, the privacy provisions of the Gramm-Leach-Bliley Act, or any regulations promulgated under any of these laws. No Closed Loan or Loan Package is a "high cost" mortgage loan with terms prohibited by HOEPA or applicable state laws. No Closed Loan or Loan Package contains terms or conditions violating applicable anti-predatory lending laws or Investor Guidelines prohibiting usurious or predatory lending practices.

**⊠⊠ HOME POINT FINANCIAL**

Q.  All Loans comply with all Investor Guidelines as defined above, and any other agency or Investor Guidelines, regulations, directives and programs, as applicable. The Closed Loans and Loan Packages are eligible for purchase and/or the issuance of insurance by the applicable investor or agency, and if applicable, are eligible for securitization by GNMA.

R.  Correspondent possesses the requisite qualifications and staff to originate Loans and conduct business pursuant to this Agreement, and holds and maintains in good standing all permits, registrations, licenses, renewals and approvals as required by applicable federal, state and local law. Correspondent shall submit copies of such permits, registrations, licenses, renewals and approvals to Purchaser upon request. Correspondent shall immediately notify Purchaser in writing if any permit, registration, license, renewal or approval it holds is suspended, terminated or cancelled for any reason or if Correspondent fails to comply with the qualification or licensing laws of any jurisdiction in which it conducts business.

S.  Correspondent will maintain with insurers acceptable to Purchaser errors and omissions insurance and/or a blanket fidelity bond in an amount not less than $300,000, or such other amount as may be set forth from time to time in the Seller's Guide.

T.  For each Loan Package and Closed Loan offered for sale by Correspondent, Purchaser will on a periodic basis make available to Correspondent its current rates and pricing. All rates and pricing are subject to market conditions and Correspondent agrees and acknowledges that Purchaser specifically reserves the right to change, revise and revoke its rates and pricing without notice.

U.  Data Security. Each party represents to the other that it has implemented and will maintain  an information security program that is designed to (i) ensure the security and confidentiality of Customer Information, (ii) protect against any anticipated threats or hazards to the security or integrity of Customer Information, and (iii) protect against unauthorized access to or use of Customer Information that could result in substantial harm or inconvenience to the other party or to any Borrower. In addition, and not by way of limitation, each party shall be responsible for maintaining security for its own systems, servers, and communications links as necessary to (x) protect the security and integrity of the other party's systems and servers on which Customer Information is stored, and (y) protect against unauthorized access to or use of its own systems and servers on which Customer Information is stored.

V.  Correspondent is an approved seller/servicer of conventional residential adjustable and fixed-rate mortgage Loans for Fannie Mae, Freddie Mac and/or GNMA and/or is a FHA, VA, USDA and/or HUD-approved mortgagee and has not been suspended as a mortgagee by the FHA, VA, USDA or HUD ("Approved Seller/Servicer/Mortgagee"); if Correspondent is not an Approved Seller/Servicer/Mortgagee, Correspondent originates Loans that are saleable to, or

 HOME POINT FINANCIAL

insurable by secondary market investors or insurers, as applicable, including but not limited to Fannie Mae, Freddie Mac, GNMA, FHA, VA, USDA and HUD and any other secondary market investor or insurer in accordance with the applicable Loan product and program requirements included in the Seller's Guide. No event has occurred, including but not limited to a change in insurance coverage, that would make Correspondent unable to comply with Fannie Mae, Freddie Mac, GNMA, FHA, VA, USDA or HUD eligibility requirements or that would require notification to Fannie Mae, Freddie Mac, GNMA, FHA, VA, USDA or HUD.

W. Correspondent has complied in all respects with applicable provisions of Regulation Z and the Dodd Frank Act in compensating its employees or any mortgage broker who served as a "Loan Originator" (as defined at Section 1026.36 of Regulation Z) with regard to each Loan, including without limitation, provisions that prohibit a Loan Originator from receiving compensation that varies based on the terms of the Loan (other than the amount of principal), and from receiving from any person other than the Borrower any origination fee or charge, except bona fide third party charges not retained by Correspondent, the Loan Originator or their respective affiliate. Correspondent and each of its employees or any mortgage broker serving as a Loan Originator with regard to the origination of any Loan have complied with the requirements of Sections 1026.36(d) and (e)(1) of Regulation Z. Specifically, and without limiting the foregoing, neither Correspondent nor any such Loan Originator directed or steered the Borrower to consummate the Loan transaction based on the fact that the Loan Originator would receive greater compensation from Correspondent in the transaction than in other transactions Correspondent offered or could have offered to the Borrower, unless the Loan is in the Borrower's interest.

X. The Loan was underwritten by Correspondent in accordance with underwriting standards that are acceptable to Fannie Mae, Freddie Mac and GNMA, as applicable, and/or in accordance with Purchaser's guidelines in effect at the time the Loan was originated. Where applicable, the Loan was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA, USDA and/or HUD requirements and industry standards. The Loan is saleable to Fannie Mae, Freddie Mac and GNMA, as applicable, on a non-recourse basis. The Note and Mortgage with respect to each Loan are on forms acceptable to Fannie Mae and Freddie Mac.

Y. Where required under applicable Program Requirements, the Loan File with respect to each Loan contains an appraisal supporting the value of the related Mortgaged Property as stated in the Loan application and meeting all applicable legal, investor and agency requirements and that is made and signed, prior to the approval of the Loan application, by a qualified and properly licensed appraiser (and not under any licensing authority sanction), duly appointed by Correspondent, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, whose compensation is not affected by the approval or

**HOME POINT FINANCIAL**

disapproval of the Loan and who met the minimum qualifications of Fannie Mae and Freddie Mac. Any appraisal and all appraisal practices used in originating the Loan (i) conform to the requirements of Fannie Mae and Freddie Mac and (ii) comply with the Appraiser Independence Requirements developed by Fannie Mae, Freddie Mac and the Federal Housing Finance Agency. Each appraisal has been performed in accordance with the applicable provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989.

Z.   In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the mortgagor.

AA. The proceeds of each Loan have been fully disbursed to or for the account of the related Borrower(s) and there is no obligation for Correspondent or any successor to advance additional funds thereunder and any and all requirements as to completion of any on-site or off- site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees, mortgage insurance premiums and other expenses incurred in making or closing the Loan and the recording of the related Mortgage have been paid, and the Borrower is not entitled to any refund of any amounts paid or due to the lender pursuant to the note or related mortgage with respect to each Loan.

BB. Purchaser may perform its own independent quality control review or audit of a Loan, which results remain the privileged work product of Purchaser and will not be disclosed to Correspondent. These actions do not relieve or replace the obligation of Correspondent to verify the accuracy of all information. The failure of Purchaser to perform a quality control review or audit on a Loan shall not be a defense to or release of Correspondent's liability or indemnity under this Agreement.

<u>INDEMNIFICATION, REPURCHASE AND REMEDIES OF PURCHASER</u>

8.   Indemnification; Rescission.
   A.   <u>Indemnification:</u> Correspondent shall indemnify, defend, and hold harmless Purchaser, its affiliates, directors, officers, agents, and employees, successors and/or assigns, from and against any and all damages, losses, liability, costs, actions, causes of action, judgments, claims, demands, regulatory agency or governmental proceedings or investigations, investor repurchase demands or sanctions, attorneys' fees, court costs or expenses both direct and indirect, arising out of or related to (i) Correspondent's breach of any representation, warranty

HOME POINT FINANCIAL

or covenant set forth in this Agreement; (ii) Correspondent's failure or omission to perform any obligation set forth in this Agreement; and (iii) any fraud (whether active fraud or fraudulent omission) or misrepresentation is found to exist in any Loan or any documents related to the Loan or utilized in any way during the origination process. In all actions brought by or involving third parties in which Purchaser has the right to be indemnified under this Paragraph, Purchaser shall have the complete and exclusive right to determine the conduct and defense of such legal proceeding or investigation with such third party including, without limitation, the right to compromise, settle, defend or continue any such action.

    i.    <u>Additional Indemnification for Home Improvement Loans</u>. If Purchaser purchases a Loan from Correspondent in which all or part of the proceeds of such Loan were paid to a home improvement or building contractor (including where the proceeds check was made payable to the Borrower and the contractor jointly) for the purpose of repairs or improvements to the related Mortgaged Property, Correspondent agrees to indemnify Purchaser, in addition to the indemnification provided under subsection 8(a) above, against any loss, damages, forfeitures, legal fees and other costs resulting from any demand, defense or assertion based upon or arising from a Borrower's right, claimed or granted, to withhold payment of the Loan due to the incompletion or unsatisfactory completion of said repairs or improvements.

    B.    <u>Rescission:</u> If any Loan originated under this Agreement is rescinded or withdrawn by the borrower pursuant to applicable law, Correspondent will refund the rescinding Borrower any and all origination fees and compensation received in connection with the subject loan; and Correspondent will reimburse Purchaser for all fees, costs and funds advanced by Purchaser to Correspondent in the event of such rescission. Any fee or compensation due to Correspondent shall not be deemed earned or payable until the Loan transaction has been closed, funded and the applicable rescission period has ended.

9.    Quality Control Reporting. Correspondent understands and agrees that Purchaser may report information about any Loan that Purchaser reasonably believes to contain misrepresentations and/or irregularities to any applicable regulatory agency, including without limitation FNMA, FHLMC, FHA, HUD, GNMA, VA, USDA, any state banking department, FinCEN, the CFPB, and/or any mortgage industry background database. Correspondent fully and irrevocably releases Purchaser from any and all damages, losses, liabilities, costs, actions, causes of action, judgments, claims, demands or expense that may arise from the reporting or use by any database subscriber of any information submitted by Purchaser with respect to Correspondent and its employees to any such mortgage industry background database.

10.    Repurchase By Correspondent.

 HOME POINT FINANCIAL

A. Repurchase Obligations. Notwithstanding any independent investigation or evaluation of a Loan by Purchaser prior to purchase, Purchaser may, in its sole and exclusive discretion, require Correspondent to repurchase any Loan:

    i. That was underwritten by Correspondent and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement, the Program Requirements or the Seller's Guide in effect as of the date that the Purchaser purchased such Loan

    ii. That was underwritten by Correspondent and/or originated based on any materially inaccurate information or material misrepresentation made by a Borrower, or by Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

    iii. That was or is capable of being rescinded by the applicable Borrower pursuant to the provisions of any applicable federal law or state law or regulation (including without limitation, the Truth in Lending Act);

    iv. That must be repurchased from any secondary market investor (including but not limited to Fannie Mae, Freddie Mac, FHA, VA, HUD, GNMA or USDA) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or a failure by Correspondent to comply in all material respects with the applicable terms, conditions, requirements and procedures included in the Program Requirements or Seller's Guide. When the Purchaser must repurchase a loan from any secondary market investor regardless of the reason(s) and/or the merit(s) of any reason, the Correspondent must repurchase from the Purchaser on demand without regard to any efforts the Purchaser may or may have not taken directly or indirectly with any secondary market investor to mitigate repurchase; and/or

    v. Where the related Loan was underwritten by Correspondent and the Borrower(s) is delinquent for a period of at least 90 days with regard to any of the initial four (4) payments due under a Note and Mortgage following the sale of the related Loan to Purchaser (an "Early Delinquency Loan").

    vi. FHA Mortgage Insurance Certificate. Correspondent shall, with respect to each FHA Loan sold to Purchaser hereunder, deliver to Purchaser a FHA Mortgage Insurance Certificate evidencing that the Loan has been endorsed for FHA insurance within 60 days of the date on which the Borrower executed the Note evidencing the Loan. Correspondent shall repurchase from Purchaser for the

**HOME POINT FINANCIAL**

Repurchase Price (as defined in subsection 10(b)) immediately upon expiration of such 60-day period any FHA Loan for which Correspondent has failed to deliver to Purchaser within such period the FHA Mortgage Insurance Certificate required under this subsection.

B.  Opportunity to Cure. Correspondent will, upon notification by Purchaser, correct or cure the defect identified by Purchaser with regard to a Loan within the time prescribed by Purchaser to the full and complete satisfaction of Purchaser. If, after receiving such notice from Purchaser, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at Purchaser's sole discretion, either (i) repurchase such defective Loan from Purchaser at the Repurchase Price, or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Purchase Price) as Purchaser may deem appropriate. For this purpose, the "Repurchase Price" with regard to a defective Loan that is subject to repurchase under this section 10(b) means the sum of: (1) the unpaid principal balance of the Loan; (2) all accrued but unpaid interest due Purchaser the date of repurchase; (3) all expenses, including but not limited to reasonable attorneys' fees incurred by Purchaser in enforcing Correspondent's obligation to repurchase such Loan; (4) any servicing expenses relating to the Loan, including any servicing advances made by Purchaser as servicer; and (5) any premiums paid to Correspondent for purchase of the Loan. If Purchaser requests a repurchase of a defective Loan, Correspondent shall, within ten business days of Correspondent's receipt of such repurchase request, pay to Purchaser the Repurchase Price by cashier's check or wire transfer of immediately available funds. If such defective Loan is owned by Purchaser at the time of repurchase by Correspondent, Purchaser shall, upon receipt of the Repurchase Price, release to Correspondent the related Loan File and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan. Purchaser shall have the right to offset the amount owed by Correspondent to Purchaser pursuant to this Section 10(b) at any time, without prior notice, against the Purchase Price for any Loan or against any and all balances, credits, accounts, or monies of Correspondent then or thereafter held by Pur-chaser. Purchaser is under no obligation to submit any claim to any secondary market in-vestor and Purchaser will have complete discretion whether to make such claim. The par-ties acknowledge that not making a claim is not a failure to mitigate. During the time pe-riod commencing on the date that Purchaser demands repurchase of a Loan from Corre-spondent, Purchaser reserves the right to take any or all of the following actions, in its sole and absolute discretion: (i) place Correspondent in a suspended status; (ii) prohibit new submissions from Correspondent; and (iii) immediately cease all activity by Purchaser on loans previously submitted by Correspondent. Should Correspondent fail to comply with all terms of Purchaser's written repurchase demand, in addition to any other

**HOME POINT FINANCIAL**

remedy which Purchaser may elect to pursue, this Agreement will be automatically terminated for cause. The Correspondent's Obligations will survive the termination of this Agreement and will apply to all the transactions under this Agreement whether or not Purchaser relies on, or knows any facts that vary with, the Correspondent's Obligations.

C.   No Limitation. The repurchase by Correspondent may be required by Purchaser whether or not the Borrower on the Loan is making payments at the time of repurchase. The repurchase by Correspondent of any Loan does not in any way eliminate, diminish or impair Correspondent's indemnification obligations contained in this Agreement.

11.   Non-Solicitation. Correspondent agrees that for all Loan Packages and Closed Loans sold to Purchaser, Correspondent, its employees, vendors and agents shall refrain from soliciting the borrowers, directly or indirectly, for the sale of any consumer financial services or products, including refinance transactions or new mortgage loans, for a period of one hundred fifty (150) days following the date of transfer of the Loan Package or Closed Loan to Purchaser.

12.   Early Loan Payoff. If any Closed Loan or a loan resulting from a Loan Package sold by Correspondent to Purchaser is paid in full within one hundred fifty (150) days from the purchase date of the Loan by the Purchaser, Correspondent shall promptly refund to Purchaser all consideration received from Purchaser for that Loan including any premium(s) paid to Correspondent for purchase of the loan and shall reimburse any other actual costs, expenses, damages or losses incurred by Purchaser arising out of or related to the early payoff, including, without limitation, agency or investor penalties or charges assessed against Purchaser, and Purchaser's reasonable attorneys' fees. This refund must be paid without regard to the circumstances of the payoff, whether caused by a borrower-initiated refinance with Correspondent or a third party lender, Purchaser buying borrowers' new loan with Correspondent, or Purchaser selling borrowers' loan to a third party prior to payoff.

13.   Early Delinquency Loan. In the event that any of the first four (4) monthly Loan payments due to Purchaser becomes ninety (90) days or more delinquent, Correspondent shall within 15 days after receipt of notice from Purchaser (i) promptly refund to Purchaser all consideration received from Purchaser for that Loan including any premium(s) paid to Correspondent for purchase of the Loan (ii) reimburse the full amount of any actual costs, damages, losses, fees, expenses, or liabilities directly or indirectly incurred by Purchaser arising from the Borrower's payment default. With regard to (i) in the preceding sentence, Correspondent hereby acknowledges that Purchaser, in lieu of requiring Correspondent to repurchase an Early Delinquency Loan pursuant to Section 10(a)(5) hereof, may itself repurchase the Loan from the secondary market investor to which Purchaser sold the Loan. In such event, Purchaser may exercise certain remedies with regard to


HOME POINT FINANCIAL

the Early Delinquency Loan including, without limitation, reselling the Loan at a discount, foreclosing and selling the collateral securing the Loan or effecting a short sale with regard to such Loan. Correspondent further acknowledges that Purchaser's exercise of these remedies may result in damages subject to reimbursement by Correspondent pursuant to this paragraph. Purchaser shall have full discretion to deal with an Early Delinquency Loan as it sees fit and shall not be required to consult with or give notice of such action to Correspondent. Purchaser is under no obligation to submit any claim to any secondary market investor regarding an Early Delinquency Loan and Purchaser will have complete discretion whether to make such claim and that the parties acknowledge that not making a claim is not a failure to mitigate.

14. No Remedy Exclusive. No remedy conferred upon or reserved to Purchaser in this Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of same, but any such right and power may be exercised from time to time and as often as may be deemed expedient. Purchaser is not required to give any notice to exercise any remedy reserved to it in this Agreement, other than where this Agreement expressly requires notice.

<u>MISCELLANEOUS</u>

15. Termination; Default.
   A. <u>Voluntary Termination.</u> This Agreement may be voluntarily terminated without cause by either Party upon five (5) business days' advance written notice to the other Party. For purposes of this Agreement, the term "Business Day" shall mean a day on which the offices of Purchaser are open to the public for carrying on substantially all of Purchaser's business functions. Termination under this Paragraph shall not affect any outstanding Rate Locks or any Purchase Advice documents issued to purchase Loan Packages or Closed Loans; provided, however, that Purchaser shall not be required to honor any Rate Lock for a Loan Package which is not closed prior to the last day of such five-day notice. Correspondent understands that Purchaser may discontinue buying Loans under this Agreement at any time and this discontinuance may occur irrespective of the quantity and quality of Correspondent's submissions and despite Correspondent's satisfactory performance under this Agreement. Purchaser further reserves the right to refuse the submission of Loan Packages and to refuse to purchase any Closed Loans submitted by Correspondent during this five (5) day termination notice period.

   B. <u>Termination by Purchaser.</u> Purchaser, in its sole and absolute discretion, may terminate this Agreement immediately upon written notice to Correspondent upon the occurrence

**HOME POINT FINANCIAL**

of any of the following events: (i) Correspondent materially fails to perform any of the terms or conditions of this Agreement; (ii) Correspondent materially breaches any of its representations or warranties in this Agreement; (iii) Purchaser reasonably believes that Correspondent has acted negligently in the conduct of its business or in a manner which Purchaser reasonably believes to be unsafe or unsound; (iv) Purchaser reasonably believes that fraud or any other material misrepresentation of fact exists or was perpetrated by any party with respect to any Loan Package or Closed Loan; (v) Purchaser reasonably believes that Correspondent has violated any laws or regulations with respect to any Loan Packages or Closed Loans; or (vi) any of Correspondent's branches or business locations is closed as the result of any governmental, regulatory, investor or agency action, consent order, debarment, suspension or any other act or order prohibiting Correspondent from originating Loan Packages and Closed Loans. Purchaser may further refuse purchase of any Loans submitted by Correspondent prior to termination under this Paragraph. Purchaser's obligation under any existing Rate Lock or Purchase Advice shall immediately terminate, although Purchaser, in its sole and absolute discretion, may continue to honor any outstanding Rate Lock or Purchase Advice.

C.   <u>Further Liabilities</u>. Except as otherwise provided herein, upon the effective date of any termination of this Agreement, neither party will have any further liabilities or obligations to the other except that, (i) such termination will not affect any liabilities and obligations of either party relating to (x) Loans sold to Purchaser prior to termination, or (y) in the event of termination other than for cause, Loans approved by Purchaser before the effective date of termination, and (ii) paragraphs 7(U) regarding the privacy and security of Customer Information will survive the termination of this Agreement.

16.   Confidentiality. The Parties agree that any information and documents that are furnished to each other for the purposes of performing their respective obligations under this Agreement or that are produced or are otherwise furnished to or come to the attention of either Party are confidential and shall be used only for the purposes of this Agreement. Such information and documents include, without limitation, the terms of this Agreement; services and information concerning current, future, or proposed products, pricing and services and combinations of products, pricing and services; financial information; mortgage loan files and all other information relating in any way to a loan applicant, including nonpublic personal information protected from disclosure by the terms of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq.; and any or all other information, data or materials relating to the business, trade secrets or technology of either Party, its customers, clients, employees, business affairs, affiliates, subsidiaries and the affiliates of its parent organization (all of the foregoing collectively referred to as "Confidential Information").

 HOME POINT FINANCIAL

Each Party shall maintain the Confidential Information of the other in confidence using the same care and discretion to avoid disclosure of Confidential Information as it uses to protect its own confidential information that it does not want disclosed, but in no event less than a reasonable standard of care. Each Party further agrees to (a) restrict disclosure of Confidential Information of the disclosing Party solely to persons who need to know the Confidential Information to perform under this Agreement, (b) not to disclose any Confidential Information to any third party or copy Confidential Information for any use not specified herein or in the Guidelines or Correspondent Seller Guide without written approval of the disclosing Party, and (c) inform those third parties and other persons who receive Confidential Information of its confidential nature and obtain their written agreement to abide by the obligations set forth herein. The obligations imposed under this Agreement shall not apply to Confidential Information that is (a) made public by the Party whose Confidential Information is disclosed, (b) generally available to the public other than by a breach of this Agreement by the receiving Party, its employees or agents, or (c) rightfully received from a third person having the legal right to disclose the Confidential Information free of any obligation of confidence, nor shall this Section be deemed to prohibit any disclosure by a Party that is necessary or appropriate in such Party's work with its legal counsel, accountants, auditors, or as required by applicable law.

Each Party acknowledges and agrees that any breach or threatened breach of any of the provisions of this Section by the other Party will result in immediate and irreparable harm and that any remedies at law in such event will be inadequate. The Parties agree that such breaches, whether threatened or actual, will give the disclosing Party the right to obtain injunctive relief to restrain such disclosure or use. This right shall, however, be in addition to and not in lieu of any other remedies at law or in equity. Disclosure of Information to Regulators. Correspondent hereby consents to the disclosure of information regarding Correspondent and any information included in any Loan Package delivered to Purchaser hereunder, including any information concerning any prospective or existing mortgagors or Mortgaged Property, appraisers and other third parties engaged by Correspondent or through Correspondent's efforts, or any other information regarding the business of Correspondent, to state or federal agencies in response to administrative or court subpoenas or upon written request of such agencies. Should Purchaser be served with a subpoena or court order or be presented with an official inquiry or investigation from a state or federal regulatory or licensing authority, Correspondent waives any and all objections to response by Purchaser and waives, discharges and releases Purchaser from all liability for compliance with any such order, inquiry or investigation.

17. Continuing Disclosure. Correspondent acknowledges that its duties and obligations of full and truthful disclosure to Purchaser under this Agreement are continuous and agrees to promptly notify Purchaser of any change in ownership, a downgrade or diminution of financial condition, the initiation of an investigation or administrative proceeding, litigation threatened, existing or



settled, commencement of a civil enforcement proceeding, judgment entered or fine levied, an arraignment, indictment or conviction, the termination or suspension by other investors or agency as an approved seller or servicer, default under a repurchase agreement, reduction in capacity or loss of warehouse lines, the imposition of a license revocation, restriction or suspension, or any other matter reasonably related to any impairment or diminution of Correspondent's ability to perform its duties and responsibilities under this Agreement.

18. Waiver. Purchaser's failure at any time or with respect to a particular Loan Package or Closed Loan to enforce any term or provision of this Agreement shall not be construed to be a waiver of that term or provision with respect to any other transactions with Correspondent or any other Loan Packages or Closed Loans.

19. Equitable Relief. The remedies for a breach of Correspondent's representations, warranties and covenants are unlimited both in law and equity at the sole and absolute discretion of Purchaser, which may include, but is not limited to, injunctive relief on an ex parte basis to preserve Purchaser's interests. Correspondent agrees that a breach of this Agreement shall result in irreparable harm to Purchaser.

20. Notices. Any notice or demand that is required or permitted to be given by a provision of this Agreement shall be deemed to have been sufficiently given if either served personally or sent by prepaid first class, registered, or certified mail or by overnight courier, addressed to the Party at its address set forth below. Either Party may change its address at any time by written notice to the other.

If to Purchaser:
Home Point Financial Corporation
2211 Old Earhart Road, Suite 250
Ann Arbor, MI 48105
Attn: Executive Managing Director, TPO
With a copy to: Managing Director, Legal

If to Correspondent:
COMPANY: AHL FUNDING
ADDRESS: 611 ANTON BLVD #1050
CITY, STATE, ZIP: COSTA MESA   CA 92626
CONTACT NAME/TITLE: BRENT MCELWEE

 HOME POINT FINANCIAL

21. Governing Law and Venue; Severability. This Agreement shall be governed by and construed under the laws of the State of Michigan, without regard to the conflict of laws principles applied in the State of Michigan. Purchaser and Correspondent hereby agree that any litigation arising out of or relating hereto or the transactions and activities contemplated hereby shall be submitted or be brought in Michigan. The parties hereto hereby agree to submit to the venue and jurisdiction of the state courts of Washtenaw County, Michigan or the U.S. District Court for the Eastern District of Michigan and the parties agree that all discovery, including depositions as become necessary, shall take place in Ann Arbor, Michigan unless otherwise agreed to by the parties. The parties further agree that should the parties agree to a third party mediation or are ordered by the court of proper jurisdiction to submit to arbitration that those proceedings shall take place in Ann Arbor, Michigan.The parties hereto waive any right to trial by jury with respect to any action brought pursuant, or in any way related, to this Agreement. Whenever possible, each provision hereof shall be interpreted in a manner as to be valid and effective under applicable law, but if any provision hereof is found to be prohibited or invalid, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provisions hereof. This paragraph will survive the termination of this Agreement.

22. Severability; Modification; Survival. This Agreement is the entire agreement of the Parties and supersedes any prior oral or written agreements, representations or promises made by and between the Parties. This Agreement may not be altered, modified or amended unless such alteration, modification or Amendment is in writing, executed by the Parties and attached to this Agreement as an Exhibit. In the event any provision contained in this Agreement is found illegal or unenforceable, this Agreement shall be construed as if the illegal or unenforceable provision were not a part of it.

   All of the Parties' covenants, warranties, representations, obligations, rights and responsibilities as to all Loans previously purchased by Purchaser shall survive the expiration of this Agreement. In addition, the following Sections shall survive termination of this Agreement: 1, 2, 3, 4, 5, 6, 7(A)-(BB), 8, 9, 10, 11, 12, 13, 16, 17, 21, 23, 25, 26.

23. No Assignment. Correspondent may not transfer, assign, delegate or sell any of its rights under this Agreement. If Correspondent is sold to, acquired by, merged or consolidated with a third party, or if more than 25% of the beneficial ownership of Correspondent is sold, transferred or otherwise conveyed to a third person or entity during the term of this Agreement, this Agreement shall be immediately terminated.

24. Relationship of the Parties. This Agreement does not create any partnership, joint venture, employment or agency agreement between the Parties. Correspondent acknowledges that it is an independent contractor and lacks the requisite authority to solicit, bind or commit Purchaser to any contract or transaction.

Home Point Financial Corporation - 2211 Old Earhart Road , Suite 250 - Ann Arbor, MI 48105 - NMLS# 7706

(Revised 10/1/2018)


HOME POINT FINANCIAL

25. Set-Off. Correspondent grants Purchaser the unconditional right of set-off. Correspondent agrees that Purchaser shall have the right at any time, without notice, to the extent permitted by law, to offset against any amounts to which Correspondent may be entitled under this Agreement any amounts owed or which become owed by Correspondent to Purchaser, whether under this Agreement or otherwise.

26. Attorneys' Fees and Costs. Correspondent acknowledges that Purchaser shall be entitled to recover all its reasonable attorneys' fees in the event (a) Correspondent breaches any Representation or Warranty set forth herein, (b) Purchaser is otherwise required to repurchase any Loan pursuant to Section 10 hereof, and/or (c) Purchaser is required to commence litigation to enforce any provision of this Agreement (in which event, Purchaser shall also be entitled to recover court costs).

27. Limited Power of Attorney. Correspondent agrees to execute, simultaneously with the signing of this Agreement, a Limited Power of Attorney in favor of Purchaser in the form attached as Exhibit "A".

28. Review by Counsel; No Presumption Against Drafter. Correspondent has read and understands the terms of this Agreement and has had the opportunity to select and retain the services of independent legal counsel before entering into this Agreement. This Agreement shall not be construed against the Party drafting or preparing the original or any subsequent written modification or amendment solely by virtue of that Party's drafting or preparation.

IN WITNESS WHEREOF, _AHL FUNDING_ and Home Point Financial Corporation have caused this Correspondent Loan Purchase Agreement to be executed as of the date first written above.

HOME POINT FINANCIAL CORPORATION

AHL FUNDING

BY: _____

BY: _____

PRINTED NAME: _____

PRINTED NAME: BRENT MCELWEE

TITLE: _____

TITLE: PRESIDENT

---

**HOME POINT FINANCIAL**

# EXHIBIT A

## LIMITED POWER OF ATTORNEY

This Limited Power of Attorney is executed as of the 26 day of [APRIL ], 20[19], by AHL FUNDING , a CA CORP ("Correspondent"), having its principal place of business at 611 ANTON BLVD. #1050 COSTA MESA CA 92626 in favor of HOME POINT FINANCIAL CORPORATION, a New Jersey corporation ("Purchaser"), having its principal place of business at 2211 Old Earhart Road , Suite 250- Ann Arbor, Michigan 48105. Correspondent and Purchaser have entered into that certain "Correspondent Mortgage Loan Purchase Agreement" on the _____ day of APRIL 26 , 20 19 (the "Agreement") pursuant to which Purchaser agreed to accept from Correspondent for review and possible purchase all of Correspondent's right, title and interest in and to certain mortgage loan document packages ("Loan Packages"), closed mortgage loans ("Closed Loans") and the associated mortgage servicing rights arising from any Loan Packages or Closed Loans (the "Servicing Rights"). All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

Correspondent hereby constitutes and appoints Purchaser, by and through any of Purchaser's Managing Directors or more senior officers, its true and lawful Attorney-in-Fact, in its name, place and stead and for its benefit, for the following limited purpose:

- Endorsing checks made out to Correspondent as payee sent by borrowers for payment on the mortgage loans related to the Servicing Rights after the date(s) of purchase of any Loan Packages or Closed Loans by Purchaser, solely to the extent such payments are due to the Purchaser.

This Limited Power of Attorney shall be effective as of the date written above and shall remain in full force and effect thereafter until a written notice of revocation hereof shall have been executed by Correspondent. The expiration or revocation of the period of agency hereunder shall in no way affect the validity of any actions of said attorney-in-fact during said period. Until a properly executed revocation of this Limited Power of Attorney is duly executed and delivered, all parties dealing with said attorney-in-fact (individually or collectively) in connection with the above described matter may fully rely upon the power and authority of said attorney-in-fact to act for and on behalf of the undersigned, and in its name, place and stead, and may accept and rely on all documents and agreements entered into by said attorney-in-fact pursuant to the powers listed herein.

The execution and delivery of this Limited Power of Attorney by Correspondent shall not be (or be deemed) a waiver or discharge of any representation, warranty, covenant or agreement of Correspondent or Purchaser in or under the Agreement, and such execution and delivery shall not be (or be deemed) a modification or amendment of any provision of the Agreement in any respect.

HOME POINT FINANCIAL

Purchaser hereby agrees to indemnify and hold Correspondent and its directors, officers, employees and agents harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by reason or result of or in connection with the exercise by Purchaser of the powers granted to it hereunder. The foregoing indemnity shall survive the termination of this Limited Power of Attorney and the Agreement or the earlier resignation or termination of Correspondent under the Agreement.

This Limited Power of Attorney shall be governed by and construed and enforced in accordance with the laws of the State of Michigan, without regard to any conflicts of law rules that might apply the laws of any other jurisdiction.

Third parties without actual notice may rely upon the exercise of the powers granted under this Limited Power of Attorney, without inquiry as to the terms and provisions of the Agreement and may be satisfied that this Limited Power of Attorney continues in full force and effect until revoked in writing by Correspondent.

[signature page follows]

**HOME POINT FINANCIAL**

IN WITNESS WHEREOF, the undersigned has executed and delivered this Limited Power of Attorney.

Company: AHL FUNDING

By: _____

Name: BRENT MCELWEE

Title: PRESIDENT

**Witnesses:**

By: _____

Name: TOM MACK

Title: OPERATIONS

By: _____

Name: LAURA BUI

Title: SECONDARY

State of                    )

                           ) SS.

County of                  )

On APRIL 26, 2019, before me, Raymond De Santiago JR, NOTARY PUBLIC, personally appeared Brent McElwee , Tom Mack , and Laura Bui _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose names is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her authorized capacity, and that by his or her signature on the instrument the entity, on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____

Notary Public in and for said                    [SEAL]

County and State   Orange CALIFORNIA

RAYMOND DE SANTIAGO JR
COMM. #2151887
Notary Public · California
San Bernardino County
My Comm. Expires May 2, 2020